## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

|  |  |
|---|---|
| SHAWNA MATONIS, an individual,<br><br>      *Plaintiff,*<br><br>v.<br><br>CARE HOLDINGS GROUP, L.L.C., a Delaware limited liability company, CARE OPTIMIZE, LLC, a Delaware limited liability company, JOSEPH N. DE VERA, .P.A., a Florida corporation, JOSEPH N. DE VERA, an individual, BENJAMIN QUIRK, an individual, JONATHAN SHIVERS, an individual,<br><br>      *Defendants.* | CASE NO: |

## COMPLAINT

Plaintiff Shawna Matonis, through undersigned counsel, files this Complaint against Defendants Care Holdings Group, L.L.C., Care Optimize, LLC, Joseph N. De Vera, .P.A., Joseph N. De Vera, Benjamin Quirk, and Jonathan Shivers[1] and states:

## INTRODUCTION

1.     This unfair competition case arises in the healthcare management consulting industry. Matonis worked as a CareOptimize independent contractor for approximately three years. She was never subject to non-compete or non-solicitation agreements with respect to the Care Companies' current, former, or prospective clients.

---

[1] Plaintiff Shawna Matonis is referred to as "Plaintiff" or "Matonis"; Care Holdings Group, L.L.C. ("Care Holdings"), Care Optimize, LLC ("CareOptimize") (Care Holdings and CareOptimize collectively referred to as the "Care Companies"), Joseph N. De Vera, .P.A. ("De Vera P.A."), Joseph N. De Vera ("De Vera"), Benjamin Quirk ("Quirk"), and Jonathan Shivers ("Shivers") are collectively referred to as "Defendants."

2.     CareOptimize altered its business model in September 2017. Among the changes was a transition from the use of independent contractors to W-2 employees. Matonis chose to part ways with the Care Companies for a multitude of reasons. Chief among them: Matonis' disagreement with certain of CareOptimize's unethical and fraudulent practices that are hallmarks of the Care Companies' business.

3.     The Care Companies were not prepared to lose Matonis and, over several months, repeatedly attempted to change her mind. Matonis rebuffed each offer; she made it clear that she was leaving CareOptimize after her remaining projects were completed or transferred from her care.

4.     The Care Companies did not take kindly to that. Fearing Matonis' fair competition, the Care Companies launched a smear campaign against her through various agents—including a member of the Florida Bar. Defendants plan of attack was threefold: They (a) falsely claimed that she was still employed by CareOptimize; (b) falsely claimed that Matonis was suffering from an illness that prevented Matonis from working; and (c) falsely claimed that she was contractually barred from working with current or former clients of the Care Companies.

5.     Defendants warned market actors that doing business with Matonis would expose them to significant liability and litigation.

6.     These lies were par for the course for the Care Companies' business model. For example, through a number of false advertisements, CareOptimize routinely misleads the consuming public by misrepresenting its client base, exaggerating the number of clients it serves, and creating the impression that it maintains relationships that have actually been destroyed by its own malfeasance.

7.    Matonis brings this action to clear her name, restore her business reputation, end Defendants' unfair competition, and recover damages caused by Defendants' unlawful conduct.

## PARTIES

8.    Plaintiff Matonis is an Ohio citizen residing in Medina County, Ohio.

9.    Defendant Quirk is a Florida citizen residing in Miami-Dade County, Florida.

10.    Defendant Shivers is a Georgia citizen residing in Forsyth County, Georgia.

11.    Defendant De Vera is a Florida citizen residing in Miami-Dade County, Florida.

12.    Defendant De Vera P.A. is a Florida for profit corporation that maintains its principal place of business at 8700 West Flagler Street, Suite 400, Miami, Florida 33174. All members are citizens of the State of Florida.

13.    Defendant CareOptimize is a limited liability company organized and existing under the laws of the State of Delaware that maintains its principal place of business at 8700 West Flagler Street, Suite 400, Miami, Florida 33174. All members are citizens of the State of Florida.

14.    Defendant Care Holdings Group is a limited liability company organized and existing under the laws of the State of Delaware that maintains its principal place of business at 8700 West Flagler Street, Suite 400, Miami, Florida 33174. All members are citizens of the State of Florida.

15.    All parties serve clients located throughout the United States.

## JURISDICTION AND VENUE

16.    The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17.     Plaintiff is seeking actual and compensatory damages in excess of $10,000,000.00 and punitive damages in excess of $100,000,000.00 for the harm Defendants' inflicted on her business and reputation in the health care management services market.

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state law claims are so closely related to Plaintiff's claims under the Lanham Act that they form part of the same case or controversy under Article III of the United States Constitution.

20.     This Court has personal jurisdiction over Defendant CareOptimize because it is a foreign limited liability company with its principal place of business in Miami-Dade County, Florida, and continuously conducts business in Miami-Dade County, Florida.

21.     This Court has personal jurisdiction over Defendant Care Holdings because it is a foreign limited liability company with its principal place of business in Miami-Dade County, Florida, and continuously conducts business in Miami-Dade County, Florida.

22.     This Court has personal jurisdiction over Defendant De Vera P.A., because it is a Florida Corporation with its principal place of business in Miami-Dade County, Florida, and continuously conducts business in Miami-Dade County, Florida.

23.     This Court has personal jurisdiction over Defendant De Vera because he is a resident of Miami-Dade County, Florida.

24.     This Court has personal jurisdiction over Defendant Quirk because he is a resident of Miami-Dade County, Florida.

25.     This Court has specific personal jurisdiction over Defendant Shivers because his contacts with Florida are directly related to Plaintiff's causes of action, he purposefully availed himself of the privilege of conducting activities within Florida, and he should reasonably anticipate being subject to this Court's jurisdiction by virtue of his long-term employment with CareOptimize and his extensive business within the state.

26.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because the Defendants are subject to personal jurisdiction in this District and because the acts complained of giving rise to the claims herein occurred in this District.

## GENERAL ALLEGATIONS

27.     The below factual background contains an overview of the relevant industry, Matonis' experience as a CareOptimize independent contractor, Defendants' statutory violations and tortious conduct, and Matonis' current market activity.

### a.     The Health Care Management Consulting Services Industry

28.     Health care management consulting service providers primarily work with health care providers to develop strategies to automate patient intake, maintain electronic health records, streamline workflows, improve revenue cycle management, and reduce administrative burdens.

29.     Prospective clients base their willingness to work with health care management consulting service providers by word of mouth and reputation.

30.     Maintaining relationships with existing clients is primarily predicated on maintaining satisfaction through accurate billing, timely responsiveness, and adequate services. Maintaining such relationships also requires the confidence of the client that the health care management consulting service provider will not add to said client's risk or legal exposure.

31.     The Care Companies offer variants of each of the aforementioned services. Presently, Matonis and the Care Companies compete in the health care management consulting services industry. But it didn't start out that way.

### b. Matonis' CareOptimize Tenure

32.     On January 8, 2016, Matonis signed a Consulting Agreement ("Consulting Agreement") with the Care Companies[2], thereby becoming CareOptimize's Vice-President of Operations. In addition to consulting for third-party health care companies, Matonis recruited, trained, and analyzed the productivity of her fellow consultants.

33.     Care Holdings is the parent company of CareOptimize and handles administrative operations for CareOptimize and its other subsidiaries.

34.     While at CareOptimize, Matonis reported to Shivers and Quirk.

35.     Quirk is CareOptimize's Chief Strategy Officer and tasked with running CareOptimize's day-to-day operations.

36.     At all times material, Shivers was CareOptimize's Chief Business Development Officer, de facto number two in command behind Quirk, and directly responsible for soliciting and locating new clients.

37.     At all times material, De Vera was, at minimum, CareOptimize's in-house counsel and a member of and lawyer for Care Holdings.

38.     The Consulting Agreement contains a boiler-plate confidentiality provision and a non-solicitation provision with respect to the Care Companies' employees, consultants, and agents. The Consulting Agreement does *not*, however, contain any restrictions on Matonis' ability to

---

[2] Matonis' Consulting Agreement is not attached as it is not in her possession.

6

solicit current or former of the Care Companies' clients or any other restrictions on her ability to fairly compete in the market.

39.     The non-solicitation provision states:

> **Covenant Not to Hire/Solicit.** Except with the other party's prior written permission, each party agrees that during the term of this Agreement and for two (2) years thereafter, it will not, whether for its own account or for the account of any other person or other business entity, (i) interfere with the other party's relationship wither [sic] (ii) endeavor to entice away from, solicit or deal with, any person or other business entity who or which at any time during the term of this Agreement *was an employee, consultant or agent of the other party*.

(emphasis added).

40.     On September 9, 2016, Matonis started Caliber RCM, LLC ("Caliber") to assist health care companies with their revenue cycle management. Matonis apprised the Care Companies of Caliber's creation and business. The Care Companies took no issue with Caliber because (1) Matonis consistently worked well over forty hours a week for CareOptimize and (2) the Consulting Agreement contained a non-exclusivity provision.

41.     Caliber did well under Matonis' guidance. After all, Matonis had spent a number of years cultivating her relationships with clients and bolstering her reputation across the industry.

42.     In September 2017, Quirk and Shivers informed Matonis that CareOptimize would no longer utilize independent contractors. Consequently, all independent contractors were to be converted to W-2 employees.

43.     On September 15, 2017, Matonis received a CareOptimize employment offer to become a W-2 employee. The offer required Matonis to accept in writing by September 22, 2017. Matonis did not accept the offer.

44.     Shortly after the deadline to accept employment passed, Quirk and the Care Companies' silent partners, Albert De Solo and Carlos De Solo, asked Matonis to meet. On September 26, 2017, the four met at Shula's 347 Grill in Coral Gables, Florida.

45.    There, Quirk asked Matonis why she had not accepted the September 15, 2017, employment offer. Matonis explained that she could not accept the proposed employment agreement's restrictive covenants, which would have prohibited her continued operation of Caliber and kept her out of the healthcare management consulting service market for two years after her employment with CareOptimize ended, particularly because the Care Companies serve healthcare providers nationwide.

46.    Matonis' concerns were not limited to the restrictive covenants, though. Matonis also learned of a number of unethical and potentially illegal practices routinely perpetrated by the Care Companies. For example, CareOptimize fraudulently billed clients for time never worked by (1) simply adding time to the billing records of CareOptimize's independent contractors and employees and (2) creating billing records from whole cloth by adding hours to the time sheets of former employees no longer associated with CareOptimize.

47.    This misconduct was not only clearly unethical and likely illegal, it frustrated the profit-sharing incentive offered to CareOptimize W-2 employees as profits were artificially decreased by phantom overhead attributable to non-existent employees, which further decreased the value of transitioning to a W-2 employee for Matonis.

48.    The Care Companies' misconduct—ordered and carried out by Shivers, Quirk, De Vera, and De Vera P.A.—also jeopardized client relationships. For example, one of CareOptimize's former clients, Center for Excellence in Eye Care ("CEEC"), stopped utilizing CareOptimize's services because it was overbilled on several different occasions.

49.    Against this backdrop, Matonis officially terminated her relationship with the Care Companies no later than July 23, 2018, a little over a month from the time she was stripped of all of her CareOptimize projects.

### c. Matonis Transitions Out of CareOptimize

50.     On October 3, 2017, Quirk emailed Matonis. He stated that, because she had refused to join CareOptimize as a W-2 employee, her projects would be transferred to others. *See* October 3, 2017, Email attached hereto as Exhibit "A". Quirk indicated that five of Matonis' projects would be transferred to CareOptimize employees Chrystal Ulferts and Ashley Gianquinta ("Gianquinta").

51.     Around that same time, Quirk informed Matonis that her remaining projects would be transferred in the coming months. After the initial five clients were transferred, Matonis was left with four remaining clients.

52.     Over the next six months, Quirk and Shivers repeatedly asked Matonis to reconsider her decision and join CareOptimize as a W-2 employee. Matonis declined each time.

53.     After finally recognizing that she was leaving, Quirk and Shivers began transferring Matonis' remaining clients to CareOptimize employees.

54.     On June 4, 2018, Matonis attended a teleconference with Quirk, Shivers, and Giaquinta. At the conclusion of the meeting, Quirk and Shivers advised Matonis that CareOptimize would handle informing the clients of the transfers. Matonis was told explicitly that there was no need for her to communicate further with her former clients.

55.     On June 15, 2018, Quirk and Shivers advised Matonis that the transition was complete and that she would no longer provide services to CareOptimize or any of her previous clients. At this point, Matonis reasonably believed her Consulting Agreement with the Care Companies to be terminated.

### d. Defendants Lie About Matonis' Departure and Post-Separation Restrictions

56.   Following Matonis' repeated rejections of CareOptimize's employment offer, the Care Companies—through Quirk, Shivers, De Vera, and De Vera P.A.—began lying about Matonis' employment status, creating the façade that she never left the company. Defendants escalated their smear campaign and set out to destroy Matonis' business reputation through lies and deceit. They succeeded.

57.   After winding down her involvement with the Care Companies, Matonis expanded Caliber to provide additional services such as consulting with providers to develop strategies to automate patient intake, maintain electronic health records, streamline workflows, and reduce administrative burdens. This was directly competitive with the Care Companies.

58.   To combat Matonis' fair competition, Quirk, Shivers, De Vera, and De Vera P.A., individually and as agents of the Care Companies, made written and oral false and misleading representations of fact regarding Matonis' commercial activities and reputation.

59.   Specifically, Defendants told multiple health care companies that Plaintiff no longer worked their accounts because of ongoing health problems (a lie), that Matonis maintained an agency relationship with CareOptimize (another lie), and that Matonis was in breach of restrictive covenants (which do not exist).

60.   Defendants further represented to Matonis' current and prospective clients that they would expose themselves to liability and litigation if they conducted any business with Matonis.

61.   Defendants' remarks were made to prevent Matonis' lawful competition and afford the Care Companies an unfair market advantage.

62.     Defendants' remarks were widely disseminated to Matonis' prospective and actual health care company clients across the relevant market sector. These false remarks were sufficiently disseminated as to constitute advertising or promotion within the health care industry.

63.     Defendants' false and misleading representations of fact were made to companies nationwide in interstate commerce and, therefore, have an effect on interstate commerce.

64.     Defendants' false and misleading representations have damaged Matonis' ability to generate new or maintain her current business.

65.     In an effort to further prevent Matonis' current and prospective clients from contacting Matonis directly for services, Defendants created a façade wherein it appears as if Matonis is still an agent of the Care Companies.

66.     The Defendants' campaign of misinformation began while she was still a Care Company independent contractor assisting in the transition of her clients to CareOptimize employees.

67.     Quirk and Shivers feared that their clients would leave CareOptimize for Matonis' company, Caliber. Propelled by that fear, Quirk and Shivers began making statements regarding Matonis to her former CareOptimize clients. Quirk and Shivers spread the falsehood that Matonis was no longer working on their accounts due to an ongoing and apparently debilitating health issue. Matonis was notified of these lies only when certain of her former clients reached out to express their concerns for her health.

68.     For example, in June 2018, Quirk went onsite to Matonis' former client, Nova Southeastern University ("Nova"), for an account management meeting. During that meeting Quirk informed Nova that Matonis could no longer work its account because she was suffering from an ongoing health condition that compromised her ability to work.

69.     Shortly thereafter, an employee from Nova reached out to Matonis to wish her well. Matonis informed her that she was not suffering from any health issues and that she had been removed from the Nova account because CareOptimize no longer utilized independent contractors.

70.     Due to the confusion, on or about June 23, 2018, Matonis emailed Nova and CareOptimize to reiterate that she no longer provided services on behalf of CareOptimize.

71.     Shortly thereafter, Matonis received another call from another former client, CEEC. Like Nova, CEEC expressed its concern for Matonis' well-being. As with Nova, Quirk had informed CEEC that Matonis had requested time off due to an ongoing medical condition that prevented her from servicing clients. Again, this was false.

72.     On July 4, 2018, Mike Clancey of Azura Vascular Health ("Azura"), a company with its principal place of business in Malvern, Pennsylvania, called Matonis to wish her a happy Fourth of July and express concerns for her well-being. Shivers had informed him that the Azura account was transferred to a CareOptimize employee because Matonis was suffering from an ongoing health issue that prevented her from working.

73.     After Matonis dispelled this false notion, Mr. Clancey emailed Quirk and Shivers to express his disappointment that they lied to him about Matonis' health and ability to work his account. *See* July 10, 2018, Email Chain attached hereto as Exhibit "B".

74.     Shortly after Mr. Clancey emailed Quirk and Shivers, Quirk called Matonis irate. Rather than apologize for the lies he and Shivers spread, Quirk demanded to know why Mr. Clancey called Matonis when she was no longer working that account.

75.     Matonis reiterated that she (a) had no health issues and (b) no longer consulted on CareOptimize's behalf.

76.     Despite that conversation, Quirk emailed Mr. Clancey, apologized for the confusion, and indicated that Matonis would be working with the Care Companies indefinitely. *See id.*

77.     On July 23, 2018, Matonis emailed Quirk and Shivers to inform them, again, that she was no longer providing services to the Care Companies.

78.     Matonis believed that her dealings with Defendants were over. She was wrong.

### e. The Care Companies' Attorney Sends Matonis and Her Clients Misleading Cease and Desist Letters

79.     De Vera and De Vera P.A. appear to have an odd relationship with the Care Companies.

80.     De Vera is simultaneously the Care Companies' (as well as a tangled web of other interconnected entities', including Caremax Medical Group, L.L.C.) in-house counsel, the sole proprietor of De Vera P.A., and the Chief Compliance Officer of Managed Health Care Partners LLC.

81.     De Vera does not maintain a separate website, email address, or physical address for De Vera P.A. Instead, his Florida Bar Member Landing Page reveals (a) his firm address is "Managed Healthcare Partners, L.L.C., 8700 W Flagler St Ste 400, Miami FL 33174-2543" (the same address as the Care Companies), (b) his email address is "jdevera@caremax.net," and (c) his firm website is "http://www.mhpmed.com," which is the Managed Healthcare Partners website.

82.     Section 7.2 of Matonis' Consulting Agreement restricts Matonis from soliciting an employee, consultant, or agent of the Care Companies only. It does nothing to restrict her ability to solicit any of the Care Companies' former, current, or prospective clients.

83.     Despite the plain language of the Consulting Agreement, De Vera, individually and through his law firm, De Vera P.A., played an integral role in preventing Matonis' fair competition.

84.     De Vera was copied, in what professional capacity is unclear, on multiple emails wherein Quirk threatened Matonis and Matonis' clients with litigation based on non-existent contractual restrictions. *See* Email attached hereto as Exhibit "C"; August 14-15, 2018, Email Chain attached hereto as Exhibit "D"; September 7-20, 2018, Email Chain attached hereto as Exhibit "E".

85.     But De Vera and his firm were not simply passive actors in Quirk and Shivers' misconduct. They stood to profit by cutting Matonis out of the market and acted on that interest. Specifically, De Vera and De Vera P.A., without indicating their actual relationship with the Care Companies, Quirk, or Shivers, sent a cease and desist letter to Matonis and her former client Azura that claimed Matonis was "subject to broad confidentiality and non-solicitation provisions, which are enforceable pursuant to applicable law" and that Matonis "breached the [Consulting] Agreement by providing confidential information and soliciting clients of" CareOptimize. *See* "Azura Cease and Desist Letter" attached hereto as Exhibit "F".

86.     This was yet another falsehood. And De Vera knew it, particularly as he likely drafted the at-issue restrictions. To be clear: Matonis is not now, and has never been, subject to any non-solicitation provisions with respect to the Care Companies' current, former, or prospective clients.

**f. Defendants Deceit and Threats Cause Matonis' Clients to Abandon Her**

87.     Azura terminated its relationship with CareOptimize in mid-June 2018.

88.     After ending its relationship with CareOptimize, Azura contacted Matonis on June 28, 2018, to inform her it was no longer a CareOptimize client and wished to utilize Matonis' services.

89.     On August 15, 2018, Mr. Clancey inadvertently sent an email to Matonis' old CareOptimize account, which she had lost access to on or around July 23, 2018.

90.     Quirk responded to Mr. Clancey's email, writing "we need to talk." *See* Ex. D.

91.     Shortly thereafter, both Azura and Matonis received the same cease and desist letter. *See* Ex. F. The Azura Cease and Desist Letter states that Matonis' agreement with CareOptimize contains "broad confidentiality and non-solicitation provisions, which are enforceable pursuant to applicable law."

92.     The Azura Cease and Desist Letter further alleges that Matonis had solicited Care Company clients in violation of the Agreement and that Azura must immediately cease and desist from "aiding and abetting" Matonis' violations. Tellingly, the Defendants never attached the Consulting Agreement or even quoted any of the purportedly pertinent language.

93.     Due to the Azura Cease and Desist Letter, Azura has refused to work with Matonis for fear of exposing itself to protracted litigation with the Defendants.

94.     This occurred on at least two additional occasions with two other former CareOptimize clients that were dissatisfied with its services.

95.     The second example of Defendants' attempts at halting Matonis' fair competition through threats and deceit is with respect to CEEC.

96.     CEEC ended its relationship with CareOptimize after it discovered CareOptimize was overbilling the account.

97.     After CEEC ended its relationship with CareOptimize, it reached out to Matonis and hired her.

98.     As occurred with Azura, an agent of CEEC inadvertently copied Matonis' former CareOptimize email address in an email correspondence. CareOptimize emailed CEEC threatening

legal action partially on the basis of the same non-solicitation provisions that, in reality, simply do not exist. *See* Ex. E.

99.     The pattern continued with Nova.

100.     After Nova ended its relationship with CareOptimize, it reached out to Matonis to hire her. After word of Nova working with Matonis reached CareOptimize, Quirk sent Matonis an email indicating that Matonis was still bound by her "non-solicitation commitment."

101.     By this point Matonis had already entered into an agreement with Nova to begin a project valued at approximately $68,000. The week Matonis began working on the project, Quirk rescinded CareOptimize's waiver, agreeing only to allow Matonis to stay on-site to complete a fraction of the work.

102.     Based on Defendants' threats of litigation, Nova has refused to work with Matonis.

**g. Defendants Create the Façade That Matonis is Still a CareOptimize Agent**

103.     As of December 1, 2018, even though Matonis' Consulting Agreement was terminated, at the very latest, on July 23, 2018, CareOptimize continues to engage in a course of action intended to mislead its actual and prospective clients by creating the façade that Matonis remains a CareOptimize agent. CareOptimize created an "out of office" auto-response message for Matonis' former CareOptimize email account, which she has not had access to since July 2018, that states: "I am out of the office on vacation. For immediate assistance, please contact ashley.giaquinta@careoptimize.com."

104.     Not only does this create the false notion that Matonis remains a CareOptimize agent, but it also taints her reputation as a competent consultant that promptly returns her clients' calls and emails.

105.    By continuing this charade, Defendants accomplish their nefarious objective: Keep their current, former, and prospective clients from reaching out to and working with Matonis.

106.    Defendants' false and misleading statements have directly harmed Matonis' ability to generate business. There are at least two companies (Ophthalmology Associates, LLC and University Clinical Health (University of Tennessee)) that Matonis is aware of—in addition to those mentioned above—that will not do business with her based on Defendants' false and misleading statements.

### h. CareOptimize's Online Misrepresentations

107.    In addition to the aforementioned misrepresentations aimed directly at Matonis, CareOptimize's website contains multiple misrepresentations sufficient to cause consumer confusion.

108.    CareOptimize's website advertises that it serves over 20,000 healthcare providers nationwide. *See* www.careoptimize.com, screen grab dated January 9, 2019.



109.    This number is grossly exaggerated. In reality, CareOptimize serves closer to 5,000 healthcare providers at any given time.

110.    CareOptimize's website also misrepresents the clientele it serves.

111.    For example, in or around June 2018, CEEC stopped utilizing CareOptimize's services. Yet, CareOptimize's website still lists CEEC as a client with which it has a seemingly healthy relationship. *See* www.careoptimize.com, screen grab dated January 9, 2019. The truth:

CEEC ended its relationship with CareOptimize after it recognized that CareOptimize was consistently overbilling its account.



112.    The same is true of Azura.[3] In or around June 2018, Azura stopped doing business with CareOptimize. Yet, it too is held out as a CareOptimize client on the CareOptimize website. *See* www.careoptimize.com, screen grab dated January 9, 2019. Azura ended its relationship with CareOptimize because it was unsatisfied with CareOptimize's services and was upset with the way the Defendants handled Matonis' transfer off of its account.



---

[3] Azura was previously known as Fresenius Vascular Nationwide.

**COUNT I**
**FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)**
(as to all Defendants)

113.     Matonis repeats and realleges Paragraphs 1 - 112 as if fully set forth herein.

114.     Matonis and Shivers, Quirk, De Vera, De Vera P.A., through the Care Companies compete in the health care management consulting services industry.

115.     Matonis has a commercial interest in her industry and business reputation.

116.     Matonis has established a business reputation of honesty, transparency, reliability, and good moral character in her performance of health care management consulting services with her clients and prospective clients. Due to her reputation, her clients and prospective clients trust Matonis' work-product.

117.     Defendants knowingly made false, misleading, and defamatory statements in commercial advertising and promotions that misrepresent and disparage the nature, characteristics, and qualities of Matonis' commercial activities, services, and reputation.

118.     Defendants falsely and misleadingly represented to Matonis' current and prospective clients that Matonis was suffering from ongoing medical issues that hindered her ability to provide services.

119.     Defendants falsely and misleadingly represented to her current and prospective clients that Matonis was subject to and in breach of restrictive covenants, including a non-solicitation provision, that restricted Matonis' ability to work on their accounts. Defendants further falsely and misleadingly represented to Matonis' current and prospective clients that, if they worked with or continued to work with Matonis, they would expose themselves to a major lawsuit.

120.     Defendants falsely and misleadingly represent to her current and prospective clients that Matonis is still an agent of CareOptimize by maintaining her former email and phone line

account, both of which, as late as December 1, 2018, and likely through the present day, indicate that Matonis is on vacation.

121.    Defendants falsely and misleadingly represent the scope of its clientele and the relationships it currently maintains with certain clients on the CareOptimize website.

122.    Defendants made such false and misleading representations verbally and in writing; in both cases, the representations were made directly to Matonis' current and prospective clients.

123.    Defendants' false and misleading representations have misled, confused, and deceived current and prospective clients as to Matonis' commercial reputation and employment status. Further, these misrepresentations have the capacity to continue misleading, confusing, and deceiving Matonis' current and prospective clients.

124.    The false and misleading representations had a material effect on Matonis' current and prospective clients' decisions to do business with her because, to wit: No company would do business with Matonis if they believed that Matonis was in breach of her contractual relationship with CareOptimize, she was potentially too ill to provide services, and that a relationship with Matonis could result in exposure to major legal liability.

125.    Defendants made these false and misleading representations in interstate commerce and these false and misleading representations affect interstate commerce.

126.    Defendants are directing their false advertisements and disparaging misrepresentations to current and prospective clients in the health care management consulting services industry to manipulate them into doing business with Defendants and ceasing all business with Matonis.

127. Matonis' injuries fall within the zone of interest protected by the Lanham Act because Defendants' false advertising and disparaging misrepresentations have caused Matonis to suffer a loss of goodwill, a loss of sales, and damage to her industry and business reputation.

128. Matonis' economic and reputational injuries were directly caused by Defendants' false and misleading representations.

129. As a direct and proximate result of Defendants' false advertisements, Matonis has suffered, and will continue to suffer, irreparable injury which cannot be measured solely in terms of monetary damages and for which Matonis has no adequate remedy at law

130. As a result of Defendants' false and misleading representations, Matonis has been damaged in an amount to be determined at trial.

## COUNT II
## <u>UNFAIR COMPETITION UNDER FLORIDA LAW</u>
(as to all Defendants)

131. Matonis repeats and realleges the allegations contained in paragraphs 1 - 112 as if fully set forth herein.

132. Shivers, Quirk, De Vera, and De Vera P.A., through the Care Companies, are market competitors with Matonis that engaged in deceptive conduct by disseminating false and misleading representations that Matonis is violating a non-solicitation agreement by working with the Care Companies' former clients.

133. Defendants falsely and misleadingly represented to Matonis' current and prospective clients that, if they worked with or continued to work with Matonis, they would risk involvement in a major lawsuit.

134. Defendants falsely and misleadingly represent to her current and prospective clients that Matonis is still an agent of CareOptimize by maintaining her former email and phone line

account, both of which, as late as December 1, 2018, and likely through the present day, indicate that Matonis is on vacation.

135.    Defendants' conduct caused consumer confusion because it had a material effect on Matonis' current and prospective clients' decisions to purchase services from or do business with Matonis.

136.    As a result of Defendants' unfairly competitive practices, Matonis has been damaged in an amount to be determined at trial.

**COUNT III**
**DEFAMATION *PER SE***
(as to all Defendants)

137.    Matonis repeats and realleges the allegations contained in paragraph 1 - 112 as if fully set forth herein.

138.    The Care Companies, through Shivers, Quirk, De Vera, and De Vera P.A., published false statements in writing and orally to multiple current and prospective clients that (1) Matonis was suffering from an ongoing health problem that affected her ability to work on their accounts, (2) Matonis is in violation of a non-solicitation agreement by working with CareOptimize's former clients, and (3) continued work with her would expose them to serious legal liability.

139.    Defendants' libelous and slanderous acts are defamation *per se* because, even when considered alone, they tend to subject Matonis to distrust, ridicule, contempt, and disgrace and are injurious to her trade and professional reputation.

140.    Defendants knew or should have known that the statements about Matonis would cause severe damage to Matonis' reputation, business opportunities, social relationships, and career.

141.    Defendants false and defamatory statements were made with actual malice because they either knew of their falsity or made the statements with reckless disregard of their truth or falsity.

142.    In making the defamatory statements, Defendants acted intentionally, maliciously, willfully, and with the intent to injure Matonis.

143.    Matonis has been harmed by the diminished economic value of the goodwill and reputation that she had built over her many years in the health care management consulting services industry.

144.    Defendants' conduct was unreasonable, outrageous, and exceeded the bounds tolerated by decent society. It was done willfully, maliciously, and deliberately to cause Matonis severe mental and emotional pain, distress, anguish, and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

145.    As a result of Defendants' defamatory statements, Matonis has been damaged in an amount to be determined at trial.

**COUNT IV**
**TORTIOUS INTERFERENCE**
(as to all Defendants)

146.    Matonis repeats and realleges the allegations contained in paragraphs 1 - 112 as if fully set forth herein.

147.    The Defendants actively sought to convince Matonis to accept their employment offer. The reason for this is simple: Defendants recognized that a number of their clients would jump ship when they realized Matonis left the company.

148.    Defendants became aware of certain former clients that stopped utilizing their services and either came to understandings or entered into agreements to work with Matonis.

Defendants were also aware that the Consulting Agreement between the Care Companies and Matonis did not stop her from working with their current or former clients.

149.    With that knowledge, Defendants intentionally and unjustifiably interfered with and continue to intentionally and unjustifiably interfere with Matonis' business relationships with her current and potential clients by, at minimum, threatening them with litigation and spreading falsehoods about Matonis.

150.    Specifically, Defendants intentionally and unjustifiably interfered with Matonis' advantageous business relationships with, at minimum: Azura, Nova, CEEC, Ophthalmic Associates, LLC, and University Clinical Health (University of Tennessee).

151.    Among other things, Defendants have tortuously interfered with Matonis' current and potential clients by telling them that she is in violation of an alleged non-solicitation provision and that working with her would expose them to litigation by virtue of their "aiding and abetting" her breach.

152.    As a result of this interference numerous companies are not comfortable utilizing Matonis' services even though they are well within their right to do so and Matonis is well within her right to service those companies.

153.    As a direct and proximate result of Defendants' tortious interference with Matonis' business relationships, Matonis has suffered, and will continue to suffer, irreparable injury which cannot be measured solely in terms of monetary damages and for which Matonis has no adequate remedy at law.

154.    Additionally, Matonis is entitled to such actual and consequential damages resulting from Defendants' conduct in an amount to be determined at trial.

**COUNT V**
**DECLARATORY JUDGMENT THAT PLAINTIFF IS NOT PRECLUDED FROM**
**WORKING WITH THE CARE COMPANIES' CURRENT, FORMER, OR**
**PROSPECTIVE CLIENTS**
(as to the Care Companies)

155.    Matonis repeats and realleges the allegations contained in paragraphs 1 - 112 as if fully set forth herein.

156.    The Defendants have each alleged—very publicly—that Matonis is bound by non-solicitation provisions that preclude her from soliciting current and former Care Company clients.

157.    Defendants caused a letter that threatened litigation predicated on a misrepresented non-solicitation provision to be delivered to Matonis' clients.

158.    According to Defendants' correspondence to Matonis' current and prospective clients, Matonis is restricted from soliciting and working with any of the Care Companies' current and former clients.

159.    A dispute exists between Matonis and the Care Companies regarding the existence, enforceability, and effect of the non-solicitation provision Defendants allege is contained in her Consulting Agreement.

160.    There exists a bona fide controversy that flows from Defendants' assertions that Matonis is bound by a non-solicitation provision regarding Care Companies' current and former clients.

161.    Both Matonis' and Defendants' legal rights, powers, and duties depend upon a declaration by this Court.

162.    All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

163.    The controversy involves the legal relationship of the parties, having adverse interests with respect to which the declaration is sought.

164.    Neither the controversy nor the facts upon which it is based are hypothetical; the parties have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the alleged non-solicitation agreement's existence, enforceability, and effect would immediately clarify the parties' respective rights, powers, and duties.

165.    Matonis seeks a declaration that she is not under any restrictions with respect to soliciting the Care Companies' current, former, or prospective clients.

## PRAYER FOR RELIEF

Matonis respectfully requests the following relief:

(1) Damages to the fullest extent permitted by law under the Lanham Act;

(2) Corrective advertising under the Lanham Act in which Defendants must communicate to Matonis' current, prospective, and former clients that:

    a.  Matonis did not have any ongoing medical condition affecting her ability to work on consulting projects;

    b.  Matonis was never subject to any restrictive covenants regarding the solicitation of the Care Companies' current, prospective, and former clients;

    c.  Use of Matonis' health care management consulting services will not, and at no point would have, expose(d) them to legal liability; and

    d.  Matonis is no longer affiliated with the Care Companies in any way;

(3) Actual and compensatory damages in excess of $10,000,000.00 for Defendants' unfair competition, tortious interference, and defamation *per se*;

(4) Punitive damages in excess of $100,000,000.00 based on the willful, wanton, and intentional nature of Defendants' conduct and defamation *per se*;

(5) Declaratory judgment that Matonis is not under any restrictions with respect to soliciting the Care Companies' clients, former clients, or prospective clients;

(6) Preliminary and permanent injunctive relief against Defendants preventing them, to the fullest extent permitted by law, from:

    a.  Interfering with Matonis' advantageous or contractual business relationships;

    b.  Utilizing Matonis' persona through a false away message and maintaining her CareOptimize email account;

    c.  Maintaining Matonis' former business phone number and voicemail; and

    d.  Misrepresenting Matonis' obligations to Defendants allegedly included in her Consulting Agreement;

(7) Pre-judgment and post-judgment interest;

(8) An award of attorneys' fees and costs of the action; and

(9) Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Matonis demands a trial by jury on all claims.

Dated: January 17, 2019

Respectfully submitted,

By: s/ *Alexander Gil*

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Alexander Gil
Florida Bar No.: 111507
agil@pollardllc.com

**Pollard PLLC**
401 E. Las Olas Blvd. #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Plaintiff Shawna Matonis*